IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | CRIMINAL ACTION NO. |
| | : | 1:12-CR-00194-CAP-JSA |
| ANTWAN LUCAS | : | |
| | : | |

## REPORT AND RECOMMENDATION

Defendant Antwan Lucas is charged with being a felon in possession of a firearm in violation of Title 18, United States Code, Sections 922(g)(1) and 924(e). *See* Indicment [1]. Atlanta Police Department officers discovered that the Defendant possessed a firearm, along with other evidence, during the execution of a search warrant at a suspected drug dealing location in May 2012. This action is before the Court on Defendant's Motion to Suppress Evidence, filed on July 31, 2012 [24]. The Defendant argues that the officers illegally seized and searched him in violation of the Fourth Amendment, and that all evidence obtained as a result should be suppressed.

The Court held an evidentiary hearing on September 19, 2012, and a transcript of the hearing ("Tr.") [29] was filed on October 3, 2012. Thereafter, Defendant filed a post-hearing brief in support of his Motion to Suppress Evidence [32] on October

24, 2012. The Government filed a response brief [36] on November 21, 2012. Defendant did not file a reply.

Having heard the evidence and having reviewed the transcript of the evidentiary hearing and the briefs of the parties, the undersigned **RECOMMENDS** that the Motion to Suppress Evidence [24] be **DENIED**. The officers possessed reasonable suspicion that the Defendant– who was found on the front lawn of the suspected drug dealing location and who did not initially comply with instructions to get down on the ground– was engaged in criminal activity and, independently, posed a danger to their security. This justified the officers' brief seizure and protective frisk of the Defendant, which resulted in discovery of the firearm. For this and other reasons discussed below, the evidence should not be suppressed.

## FINDINGS OF FACT

1.  On May 3, 2012, Officers from the Atlanta Police Department ("APD") executed a search at a residence on 1095 Peeples Street in Atlanta, Georgia, authorized by a warrant issued by a Magistrate Judge of the Fulton County Superior Court. Tr. [29] at 7-8. According to the information presented in the warrant application, APD's investigation connected this residence to drug

trafficking activity.  Gov't Hearing Exhibit 5, ¶¶ 9-12.  Indeed, a confidential informant indicated that the resident of 1095 Peeples Street residence was dealing in narcotics from that location, and that this resident allowed other known drug dealers to also do so "on a daily basis."  *Id.* ¶ 10.  Undercover officers also purchased drugs from that location. *Id.*, ¶¶ 10-12; Tr. [29] at 10).

2.  The officers understood that "oftentimes [drug dealers] have – you'll have a lookout who will just hang out front and look for any either opposing dealers, police.  Sometimes you have protection or what they call on the street muscle to guard the location again from opposing dealers... Sometimes you'll have the do-boy which is a street term for a person who like does work around the house in exchange for narcotics."  Tr. [29] at 25-26.

3.  When the officers reached the residence, they saw the Defendant and another man on the front lawn.  Tr. [29] at 14-15.  The police had no prior information about the Defendant, and did not previously suspect him of involvement in the suspected crimes.  Tr. [29] at 30-31.

4.  After leaving their marked police car, the officers shouted "police, get on the ground, get on the ground."  *Id.* at 16.  The other man immediately complied,

but the Defendant did not. *Id.* Instead, according to Officer Kenneth Fisher, "he began to like shift his weight from left leg to right leg, and he began to look around. He started looking away [from the officers issuing the commands], and they're yelling at him giving him order, and he's looking away." *Id.* Another officer, Officer Vaughn Pitts, did not recall the Defendant moving or looking around, but he did recall that "his eyes got real wide," and "he kind of like thought about it for a minute." Tr. [29] at 72-73.

5. According to Officer Fisher, who was watching the Defendant from his vehicle, "I've had several people run away from me. He looked like he was about to flee." Tr. [29] at 16. Thus, Officer Fisher "drove off the roadway and into the grass of the yard," *id.,* thereby blocking the path of escape that Officer Fisher believed the Defendant was contemplating, *id.* at 18. At that point, the Defendant complied with the instructions and "got on the ground." *Id.*

6. The search involved numerous officers wearing marked ballistic vests, jumpsuits marked "police," and helmets, and brandishing weapons including sidearms and subcompact rifles. *Id.* at 38-39. These officers arrived in marked police cars. *Id.*

7.    Officer Fisher applied handcuffs to the Defendant.  Tr. [29] at 40-41.  Officer

Fisher was present at the search in a support role, and he was not personally

prepared to cuff any suspect, so he had to obtain cuffs from another officer.  *Id.*

at 20.  Officer Fisher, who is also a Task Force Officer working with  the U.S.

Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), was attempting

to "take as minimal a role as possible" in the search, "so as not to tip our hat"

that federal authorities were involved.  *Id.* at 19-20.

8.    Although he cuffed the Defendant, Officer Fisher did not frisk him.  Tr. [29] at

20-21.  Officer Fisher explained that this was a mistake, and that suspects

possessing handguns still pose a danger to law enforcement despite being

cuffed.  *Id.* at 21-22.  According to Officer Fisher, "Handcuffs are not the end

all be all.  I Mean they're a tool that helps hinder anything that somebody may

do," but "[a] person who is in handcuffs is trained they can be defeated.  I've

seen people–officers have been shot by people in handcuffs."  *Id.*

9.    Other officers, including Officer Pitts, began executing the search by first

conducting a protective sweep of the house.  Tr. [29] at 63.  After completing

this sweep, Officer Pitts left the house, saw Defendant cuffed in the yard, and

asked Officer Fisher if the Defendant had been frisked.  *Id.* at 21, 63.  Officer

Fisher responded "no," and so Officer Pitts pulled the Defendant up off the ground and frisked the outer layer of the Defendant's clothing. Tr. [29] at 21, 63. In Officer Pitts' experience, the Defendant still presented a potential danger to law enforcement despite being cuffed. Tr. [29] at 66.

10. During the frisk, Officer Pitts found a handgun tucked into Defendant's waistband. Tr. [29] at 65-66. The Defendant had "bladed his body," that is, he turned to the side in a way that Officer Pitts interpreted as an attempt to "not let me feel the gun in his waistband." *Id.*

11. Officer Pitts testified that the Defendant was under arrest at the point Officer Pitts recovered the gun, for carrying a concealed weapon. Tr. [29] at 88. Officer Pitts did not know, and did not ask the Defendant, whether the Defendant possessed a concealed weapons permit. *Id.* at 88-89. Officer Pitts conducted a more thorough search of the Defendant, and found a bag of suspected marijuana. Tr. [29] at 65.

12. There was some confusion at the hearing as to how much time elapsed between when the Defendant was initially confronted by APD and when he was frisked, but the time appears not to have substantially exceeded 10 minutes. Officer

Fisher testified that the time elapsed was "five to ten minutes." Tr. [29] at 4. Officer Pitts stated that "approximately eight minutes" passed between when he arrived at the scene and when he frisked the Defendant. Tr. [29] at 63-64, 76. However, Officer Pitts also testified that approximately eight minutes elapsed between the end of the protective sweep and the frisk, presumably meaning that more than eight minutes elapsed from the time the Defendant was initially encountered. Tr. [29] at 84-87. Nevertheless, the Court concludes from the officers' description of the protective sweep that it was not a time-consuming search. *See Id.* at 63.

13. The Officers advised the Defendant of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966). The Defendant then made certain admissions including as to his criminal history and his possession of the firearm. Tr. [29] at 88-89.

## ANALYSIS

## I. The APD Properly Detained And Frisked Defendant Pursuant To A Reasonable Investigative Detention Under *Terry v. Ohio*

It is undisputed that when APD approached the Defendant with guns drawn, blocked his possible escape with a police car, ordered him to get on the ground, and placed him in handcuffs, the Defendant was "seized" within the meaning of the Fourth

7

Amendment. Rather, the parties dispute the legal scope of the seizure, that is, whether it amounted to an arrest.

Defendant argues that by the time he was frisked, after having been detained on the ground in handcuffs for ten or more minutes, the detention amounted to an arrest requiring probable cause. He argues that probable cause did not exist, that the frisk was not justified, and that all the resulting evidence that was obtained must be suppressed. The Government does not appear to contest the lack of probable cause prior to the frisk. Rather, the Government argues that the detention was a permissible investigation stop that did not escalate into being an arrest until after the discovery of the concealed weapon. Thus, according to the Government, the APD did not require probable cause but only reasonable suspicion of criminal activity.

The Court agrees with the Government. The APD's brief detention of the Defendant did not amount to anything more than an investigative *Terry* stop, at least until the discovery of the concealed weapon. Officer Pitts was justified in conducting a frisk of outer clothing as part of this *Terry* stop on grounds of officer safety.

### A.   The Officers Possessed Reasonable Suspicion, Justifying A *Terry* Stop

As the Supreme Court has held, "[a] person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the

officer, by means of physical force or show of authority, terminates or restrains his freedom of movement." *Brendlin v. California*, 551 U.S. 249, 254 (2007) (internal quotes omitted) (*quoting Florida v. Bostick*, 501 U.S. 429, 434 (1991) (*quoting Terry v. Ohio*, 392 U.S. 1, 19, n.16 (1968))). Nevertheless, while Defendants may have been subjected to a seizure under the Fourth Amendment, it does not mean that the seizure was unlawful because the Fourth Amendment only prohibits "unreasonable searches and seizures." U.S. Const. amend. IV.

The Supreme Court has held that a brief detention of a person may be justified if the Government can establish that the police officers had a reasonable suspicion based on articulable facts that such person may have engaged in illegal activity. *Terry v. Ohio*, 392 U.S. 1, 21 (1968); *see also United States v. Diaz-Lizaraza*, 981 F.2d 1216, 1220-21 (11th Cir. 1993); *United States v. Williams*, 876 F.2d 1521, 1523 (11th Cir. 1989). A "reasonable suspicion" requires "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [an] intrusion." *Terry*, 392 U.S. at 21. Reasonable suspicion can be based on the "totality of the circumstances" and law enforcement personnel may draw on their experience and training to make inferences and deductions about the likelihood of criminal activity. *United States v. Arvizu*, 534 U.S. 266, 273-74 (2002); *United States v. Sokolow*, 490 U.S. 1, 7-8 (1989).

Here, the Court finds that the officers possessed reasonable suspicion of criminal activity. As the warrant established, the officers arrived at the house with probable cause to believe that it was the site of drug trafficking activity. The officers saw the Defendant on the front lawn of this known drug dealing location. When they instructed him to get on the ground, he hesitated. According to one officer, he made a movement that suggested he was about to flee. The other witness did not recall seeing movement but recalled that the Defendant looked around as if trying to find an avenue of escape. Either way, he did not immediately comply. The officers also explained that it is common for drug dealers to post look-outs or guards outside of drug dealing locations. All of these facts combined to establish reasonable suspicion that the Defendant was participating in criminal activity.

Furthermore, when executing a search warrant, law enforcement officers may temporarily detain individuals for the purposes of preventing flight, maintaining control, and protecting the safety of the officers and others. *See, e.g., Croom v. Balkwill*, 672 F.Supp.2d 1280, 1293 (M.D. Fla. 2009). Here, for all the same reasons outline above, the officers possessed reasonable suspicion that the Defendant posed a danger. For this reason alone, they were justified in briefly detaining the Defendant for their protection.

**B.    The Officers Were Justified In Frisking The Defendant**

Once an officer has legitimately stopped an individual, the officer can conduct a protective pat down of the individual's outer clothing, that is, perform a "frisk," so long as 'a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.' *United States v. Hunter*, 291 F.3d 1302, 1306 (11th Cir. 2002) (quoting *Terry*, 392 U.S. at 27); *see also United States v. Bonds*, 829 F.2d 1072, 1074 (11th Cir. 1987) (independent of any justification to search for evidence of criminal activity, a law enforcement officer has a right to conduct a limited search for weapons when he has a reasonable belief that he is in danger).  If the officer feels a concealed object that he reasonably believes may be a weapon, he may reach into the suspect's clothing to seize the object.  *See United States v. Clay*, 483 F.3d 739, 743–44 (11th Cir. 2007).

Here, for the reasons explained above, the officers were reasonable in believing that the Defendant have been armed.  Indeed, the Supreme Court has recognized the danger associated with the execution of a narcotics search warrant:

> [T]he execution of a warrant to search for narcotics is the kind of transaction that may give rise to sudden violence or frantic efforts to conceal or destroy evidence. The risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation.

*Michigan v. Summers*, 452 U.S. 692, 702–703. *See also United States v. Diaz–Lizaraza*, 981 F.2d 1216, 1221 (11th Cir.1993) (noting that "[d]rug dealing is known to be extremely violent.") The circumstances justified a reasonable concern that the Defendant was armed and presented a danger.

A separate question, however, is whether the officers reasonably believed they were still in danger after the Defendant was handcuffed. If handcuffs completely addressed the safety issue, by definition there was no justification for further measures such as a frisk. *See United States v. Rogers*, 131 Fed. Appx. 138, *2 (11th Cir. 2005) (unpublished) (district court's factual finding that the government failed to prove that any danger existed justifying a frisk after the defendant was placed in handcuffs was not clearly erroneous, and as a result the frisk was not justified pursuant to *Terry*).

The Defendant argues that police lacked such a reasonable belief. Indeed, according to the Defendant, that the frisk occurred several minutes after the Defendant was cuffed "indicates that the police did not detain him for their safety–indeed that they did not suspect at all that he was dangerous...." Def. Post-Hearing Br. [32] at 14.

Here, Officer Pitts specifically explained why the handcuffs alone were not sufficient to ensure safety. Tr. [29] at 65-66. He testified that the Defendant could still have accessed a firearm in his waistband notwithstanding being cuffed. *Id.* Officer Pitts explained that he has observed suspects "take the handcuffs from the

12

bank to the front and flee," and in other cases "actually bring the cuffs around to the front of their body and, you know, zipper down their pants and use the bathroom." *Id.* Moreover, before releasing the Defendant from cuffs, given the facts that drew attention to him, Officer Pitts explained that he would be frisked to ensure officer safety. *Id.*

Although Officer Fisher did not initially frisk the Defendant, he agreed that the handcuffs alone were not sufficient to eliminate the potential risk and that he should have frisked the Defendant. Tr. [29] at 20-22. In other words, Officer Fisher explained that his failure to frisk the Defendant was not because of a lack of danger. Rather, it was a mistake, and Officer Fisher stated that the Defendant should have been immediately frisked. *Id.*

The Court credits the officers' testimony that the frisk was motivated by safety concerns and that the delay was the result of mistake. The Court also finds that this concern was reasonable and that it was reasonable in the circumstances to frisk the Defendant in addition to placing him in handcuffs.

**C.     The Seizure of the Defendant Did Not Escalate Into An Arrest Until After He Was Frisked**

The Defendant does not appear to argue that the officers lacked reasonable suspicion. He instead argues that by the time he was frisked his detention was an

arrest, not a *Terry* stop, because the extent and duration of the police restraint, among other factors, exceeded a permissible *Terry* stop. Thus, Defendant argues that the officers lacked the requisite probable cause to engage in this arrest and search.

In *Terry*, the Supreme Court adopted "a [dual] inquiry for evaluating the reasonableness of an investigative stop." *United States v. Sharpe*, 470 U.S. 675 (1985); *see also United States v. Acosta*, 363 F.3d 1141, 1144 (11th Cir.2004). Under this approach, the court examines "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Sharpe*, 470 U.S. at 682, 105 S.Ct. 1568. Whether an officer's actions were justified at the inception "turns on whether the officers had a reasonable suspicion that the [plaintiff] had engaged, or was about to engage, in a crime." *Acosta*, 363 F.3d at 1144–45. In the second part, the court looks to whether the stop was reasonably related in scope to the circumstances that justified the stop in the first place. *Id.*

In distinguishing a true investigative stop from a *de facto* arrest, a court must not adhere to "rigid time limitations" or "bright line rules," but must use "common sense and ordinary human experience." *United States v. Hardy*, 855 F.2d 753, 759 (11th Cir. 1988) (quoting *Sharpe*, 470 U.S. at 685); *see United States v. Gil*, 204 F.3d 1347, 1350 (11th Cir. 2000); *United States v. Blackman*, 66 F.3d 1572, 1576 (11th

Cir. 1995); *United States v. Hastamorir*, 881 F.2d 1551, 1556 (11th Cir. 1989). The factors that should be considered in distinguishing an investigative stop from an arrest include "the law enforcement purposes served by the detention, the diligence with which the police pursue the investigation, the scope and intrusiveness of the detention, and the duration of the detention." *Hardy*, 855 F.2d at 759; *see also Sharpe*, 470 U.S. at 685-686; *Acosta*, 363 F.3d at 1146.

> As the Eleventh Circuit has explained:
>
> There is a difference between an investigative stop of limited duration for which reasonable suspicion is enough, and a detention that amounts to an arrest for which probable cause is required. The difference is one of extent, with the line of demarcation resulting from the weighing of a "limited violation of individual privacy involved against the opposing interests in crime prevention and detection and in the police officer's safety." *Dunaway v. New York*, 442 U.S. 200, 209, 99 S. Ct. 2248, 2255, 60 L.Ed.2d 824 (1979); *see also United States v. Puglisi*, 723 F.2d 779, 785 (11th Cir. 1984).

*Acosta*, 363 F.3d at 1146-1147.

The Defendant points, in part, to the strong-arm tactics that the APD used to restrain the Defendant. Def. Post-Hearing Br. [32] at 10. Indeed, the evidence showed that multiple officers converged on the scene, wore tactical gear and carried weapons, shouted at the Defendant to get down, and even drove a vehicle onto the lawn to send the clear message to the Defendant that must comply. The officers then put the Defendant on the ground and handcuffed him.

An investigatory stop does not become an arrest, however, merely because a reasonable person would believe he was not free to leave; even handcuffing a suspect, by itself, does not automatically convert an investigative stop into an arrest. The right to temporarily detain someone "carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham*, 490 U.S. 386, 396; *United States v. Kapperman*, 764 F.2d 786, 791 n.4 (11th Cir. 1985); *see also Blackman*, 66 F.3d at 1576; *Hastamorir*, 881 F.2d at 1557. Nor does the drawing of weapons by officers or other tactics necessarily convert an investigative stop into an arrest. *See United States v. Raino*, 980 F.2d 1148, 1149 (11th Cir. 1992); *United States v. Roper*, 702 F.2d 984, 987 (11th Cir. 1983).

Here, the tactics used by the officers were reasonable in light of the circumstances. Again, they were executing a warrant in a known drug location, and their encounter with the Defendant led to reasonable suspicion that he might have presented a danger. The officers must make split second decisions as to how to protect themselves and the public in this situation. The tactics used to detain the Defendant were reasonable in the totality of the circumstances and did not convert the stop into an arrest.

Defendant also points to the length of the detention. As noted above, the Defendant was detained on the order of 10 minutes prior to the frisk. This duration,

in itself, is not particularly lengthy. Courts have upheld *Terry* stops of much longer duration without finding that the stops escalated into de facto arrests. *See Gil*, 204 F.3d at 1350 (handcuffing female defendant and detaining her in patrol car for seventy-five minutes was not unreasonable because there was no female officer available to search her for weapons); *Hardy*, 855 F.2d at 761 (a detention that lasted approximately fifty minutes was not too long to convert a *Terry* stop into an arrest). *Cf. United States v. Place*, 462 U.S. 696 (1983) (while declining to make bright-line rule, airport detention exceeding ninety minutes was unreasonable); *United States v. Puglisi*, 723 F.2d 779, 790 (11th Cir. 1984) (airport detention exceeding one hundred forty minutes was unreasonable).

The Court, however, must look at more than just the number of minutes that passed. Here, there is evidence that the officers did not frisk the Defendant as quickly as they should have. While the officers immediately detained the Defendant, they waited to frisk him for several minutes. It was not until Officer Pitts completed the initial protective sweep of the house that he came out and frisked the Defendant. The officers acknowledged that it was a mistake to have not frisked the Defendant immediately when he was cuffed and placed on the ground. The Defendant argues, and the Court agrees, that this delay reflects some lack of diligence and unnecessarily prolonged the *Terry* stop by a few minutes.

17

In the totality of the circumstances, however, the Court finds that the seizure remained a valid *Terry* stop. The delay resulting from the failure to immediately frisk the Defendant amounted to just a few minutes, that is, the duration of the officers' initial protective sweep of the house. The officers did not begin the search itself until after the frisk. While the officers could have frisked the Defendant sooner, they still did so during the initial pre-search phase of the operation that was focused on securing the safety of the premises. The Court also finds that the officers still possessed a reasonable safety concern, even after this brief passage of time, justifying the frisk of the Defendant.

Thus, the detention was of a reasonable duration for the purpose of investigating and the detention was not so long as to be transformed into a *de facto* arrest.

## II. After Officer Pitts Recovered The Weapon, Probable Cause Justified A More Complete Search

After Officer Pitts discovered the firearm as part of the protective frisk, he engaged in a more thorough search of the Defendant's pockets and recovered a bag of suspected narcotics. Tr. [29] at 66. Officer Pitts did not testify that he had felt this bag while conducting his protective pat down and believed it to be a weapon.

Therefore, this second search was not within the valid scope of the *Terry* stop and must be supported on other grounds.

Officer Pitts testified that the Defendant was under arrest, for possessing a concealed weapon, as of when Officer Pitts discovered the concealed firearm. Tr. [29] at 88-89. To the extent this arrest was supported by requisite probable cause, it permitted a full search of the Defendant's person. *See United States v. Goddard,* 312 F.3d 1360, 1364 (11th Cir.2002) (A full search incident to a lawful arrest is a permitted exception to the warrant requirement of the Fourth Amendment).

The Defendant does not present any legal argument on this question. The Defendant's legal arguments are directed at whether the frisk was justified in the first place, and whether the evidence that was discovered as a result, including the narcotics, should be suppressed. The Defendant does not separately argue that Officer Pitts lacked probable cause to search the Defendant once Officer Pitts discovered the concealed handgun.

Defendant in the factual background section of his brief, however, points out that Officer Pitts had not inquired whether the Defendant possessed a concealed weapons permit before arresting him. Def. Post-Hearing Br. [32] at 7 (citing Tr. [29] at 88-89). It is unclear whether the Defendant intended to present this as a ground for suppression, because no legal argument on this point follows. Nevertheless, the Court

has considered this issue *sua sponte* and finds that the record supports the existence of probable cause after the frisk.

Officer Pitts found that the Defendant was carrying a concealed weapon. Officer Pitts also testified that the Defendant was "blad[ing]" his body during the frisk, that is, the Defendant was turning his body away from the frisk so as to avoid discovery of the hidden gun. Tr. [29] at 65-66. As noted at length above, Defendant had already been found on the front lawn of a drug dealing location, had not initially complied with police instructions, and appeared to be considering flight before a police vehicle drove onto the lawn to stop him. The record also suggests that the Defendant did not inform Officer Pitts that he had a permit to carry the concealed firearm. These facts combine to establish that Officer Pitts possessed probable cause to believe that the Defendant did not possess a permit to carry the concealed firearm, and was therefore subject to arrest and search.

The Court finds persuasive the analysis of the First Circuit in an analogous case, *United States v. Pontoo*, 666 F.3d 20, 32 (1st 2011):

> In this type of situation, context is all-important; each case is likely to turn on its own facts. So it is here: suggesting that the officers, in the circumstances at hand, had not developed probable cause after finding a concealed weapon does violence to the sensible proposition that 'probable cause is a common sense, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.' *United States v. Vongkaysone*,

434 F.3d 68, 73–74 (1st Cir.2006) (alteration and internal quotation marks omitted). Common sense argues persuasively that if the appellant possessed a valid conceal-and-carry permit, he surely would have made that fact known.

To say more on this point would be supererogatory. In the circumstances of this case, the officer's discovery of the concealed handgun after performing a Terry stop furnished probable cause for arresting the appellant.

Here, if anything, probable cause was more justified than in *Pontoo*. Officer Pitts found the weapon after the Defendant appeared to try to prevent him from doing so by "blading" his body. And the Defendant had initially made leg and/or eye movements suggesting an intent to run when confronted by the police. These acts of evasion or contemplated evasion suggest that the Defendant was not in lawful possession of the concealed firearm.[1]

## RECOMMENDATION

Accordingly, the undersigned **RECOMMENDS** that Defendants' Motion to Suppress [24] be **DENIED**.

**IT IS SO RECOMMENDED** this 14th day of December, 2012.

---

[1] Defendant's Motion also seeks to suppress his post-arrest statements. Motion [24] at 11. The only ground offered for suppression is that the statements were the fruit of the unlawful seizure. *Id.* Because the Court finds no unlawful seizure, Defendant's argument for suppressing his statement fails.

_____
JUSTIN S. ANAND
UNITED STATES MAGISTRATE JUDGE